UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                                       Case No.: 06-24480-svk
Ricky L. Nockerts and
Geri L. Nockerts,                                           Chapter 7
            Debtors.

MEMORANDUM DECISION ON MOTION TO DISMISS

      The U.S. Trustee has moved to dismiss this case based on a presumption of abuse under Bankruptcy Code § 707(b)(2) or as an abuse under § 707(b)(3). This chapter 7 case was filed on August 15, 2006, and is governed by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). The parties have stipulated to most of the facts.

      The Debtors are "above-median" debtors; their annualized current monthly income is $82,131, which exceeds the Wisconsin median of $60,106 for a family of three. Accordingly, in BAPCPA jargon, the Debtors must pass the "means test" in order to qualify for chapter 7 relief. The means test is codified in the provisions of § 707(b)(2) and the calculations are performed on Official Form B22A. Under § 707(b)(2)(A), the case will be presumed an abuse unless the debtor passes the means test or successfully rebuts the presumption of abuse by showing special circumstances, and then only to the extent that those circumstances are proven to justify additional expenses or adjustments.

      Section 707(b)(2)(A) states that the Court shall presume that the debtor's case is an abuse of chapter 7 if the debtor's current monthly income, less the amounts deductible under § 707(b)(2)(A)(ii), (iii) and (iv), over a 60-month period, equals or exceeds the lesser of (A) 25% of the nonpriority unsecured claims in the case or $6,000, whichever is greater; or (B) $10,000. In this case, 25% of the Debtors' general unsecured claims exceeds $11,500; therefore, $10,000 is the lesser amount, and serves as the threshold for determining whether a presumption of abuse arises. If, after subtracting the allowable deductions found in § 707(b)(2)(A)(ii), (iii) and (iv), the Debtors' current monthly income exceeds $167 ($10,000 ÷ 60), the Court must presume that the case is an abuse of chapter 7 of the Bankruptcy Code. The Debtors' Amended Form B22A shows that their monthly income is $6,844.30 and their total monthly deductions total $8,625.56, so that the bottom line is a negative number. However, the U.S. Trustee takes issue with certain deductions claimed by the Debtors.

      Specifically, the U.S. Trustee focuses on § 707(b)(2)(A)(iii) which allows a debtor to deduct "average monthly payments on account of secured debts." That section provides:

> The debtor's average monthly payments on account of secured
> debts shall be calculated as the sum of–

> > (I) the total of all amounts scheduled as contractually due
> > to secured creditors in each month of the 60 months
> > following the date of the petition; and
> > (II) any additional payments to secured creditors necessary
> > for the debtor, in filing a plan under chapter 13 of this title,
> > to maintain possession of the debtor's primary residence,
> > motor vehicle, or other property necessary for the support
> > of the debtor and the debtor's dependents, that serves as
> > collateral for secured debts;
> divided by 60.

Question 42 of Form B22A, entitled "Future payments on secured claims" corresponds to this portion of the statute, and asks debtors to list the average monthly payments "due to each Secured Creditor in the 60 months following the filing of the bankruptcy case, divided by 60." In response to this Question, the Debtors listed three amounts: $2,839.00 monthly for two mortgages on their homestead; $59.40 monthly for their 2003 Chevy Avalanche; and $133.40 monthly for their 2004 Pontiac Bonneville.

The U.S. Trustee's Motion to Dismiss asserts that according to the Debtors' testimony at the §341 meeting, the Debtors are not reaffirming the mortgage debts on their homestead, are not making the monthly payment on the mortgages and intend to surrender the homestead to the secured creditors. The Debtors may not therefore "claim a Line 42 deduction for payments on collateral that they intend to surrender," since they "were not making this payment at the time they filed their bankruptcy petition and will not make this payment in the future." If this deduction is allowed, and the Debtors therefore pass the means test, the U.S. Trustee contends that their case should be dismissed under § 707(b)(3)(B), because the totality of the circumstances of the Debtors' financial situation demonstrates abuse. The Debtors objected to the Motion, and after a hearing, the Court took the matter under advisement. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law.

The first issue in this case is the construction of the words "scheduled as contractually due," found in § 707(b)(2)(A)(iii). The U.S. Trustee argues that this language allows a means test deduction only if the Debtors are actually making the monthly payment, and only if the Debtors intend to retain the collateral securing the debt. In the absence of an actual monthly payment, the U.S. Trustee contends that a debtor should list the appropriate IRS allowances, as described in § 707(b)(2)(A)(ii)(I). The Debtors, however, urge a plain reading of the statute, and assert that "scheduled as contractually due" means that a debtor may list a payment that the debtor is contractually obligated to make as of the date of the petition, regardless of what the debtor intends to do with the property.

The few courts that have decided this issue are evenly divided. The earliest case, *In re Walker*, 2006 WL 1314125 (Bankr. N.D. Ga. May 1, 2006), supports the Debtors' argument. There, chapter 7 debtors included in their means test calculations a deduction for average monthly payments on property they intended to surrender at the time of filing. *Id.* at *1. The

2

U.S. Trustee filed a motion to dismiss arguing that debtors should not be able to deduct an expense when they have no intention of making those payments in the future. The *Walker* court applied a "plain meaning" rule in intrepreting the statute, and determined that the common meaning of the words "scheduled as contractually due" is "those payments that the debtor will be required to make on certain dates in the future under the contract." *Id.* at *3. As a result of this interpretation, "nothing the debtor does or does not do changes the fact that scheduled payments remain contractually due." *Id.* at *4. The date of the petition is the applicable time frame to apply the means test, because the statute requires a determination of "how many payments are owed under the contract for each secured debt at the time of filing." *Id*. Since the debtors were contractually obligated to make payments on the date they filed for bankruptcy, the court allowed the deduction. *See also In re Oliver*, 2006 WL 2086691 (Bankr. D. Or. June 29, 2006).

The court faced the same issue in *In re Singletary*, 2006 WL 2987945 (Bankr. S.D. Tex. Oct. 19, 2006), where chapter 7 debtors deducted future payments on their house and vehicle, but also filed a statement of intention indicating they were going to surrender the property. *Id.* at *5. In analyzing § 707(b)(2)(A)(iii), the court first noted that the means test is both backward- and forward-looking at the same time. *Id.* at *6. Following Fifth Circuit precedent established in *In re Cortez*, 457 F.3d 448 (5th Cir. 2006), the *Singletary* court rejected the "snapshot" approach embraced by *Walker*. Because *Cortez* requires a court to "consider post-petition events in deciding whether to dismiss a case for substantial abuse under § 707(b)," the *Singletary* court determined it could not examine the means test strictly as of the filing date. *Id.* at *7 (quoting *Cortez*, 457 F.3d at 450). However, the court determined that a debtor would be able to deduct future expenses even if the debtor intended to surrender the property, as long as the property had not actually been surrendered as of the date the § 707(b) motion to dismiss was filed. *Id.* at *15.

Although this Court is not bound by *Cortez*, and the Seventh Circuit has no similar precedent, the decision warrants consideration. In *Cortez*, a pre-BAPCPA case, the debtor had been unemployed on the date of the bankruptcy filing, but four days later found employment at an annual salary of $95,000. The Fifth Circuit held that "post-petition events should be considered up until the date of discharge," and that a bankruptcy court "should consider any post-petition events affecting [the debtor's] financial situation, including any post-petition improvements in income, or if still applicable, . . . unemployment." 457 F.3d at 454. In considering the language of the prior statute, which conditioned dismissal on a finding "that the granting of relief would be a substantial abuse of the provisions of this chapter," the court focused on the phrase "granting of relief," reasoning that the relief was actually the chapter 7 discharge. Therefore, depending on what events occurred during the case, a substantial abuse could occur at any point up to the discharge. *Id.* at 455. In *Singletary*, although the debtors had listed both the house and a vehicle on their statement of intention, only the vehicle had been surrendered as of the date of the U.S. Trustee's § 707(b) motion, and therefore, the debtors' home mortgage payments were properly deductible on the means test, but the vehicle payments were not.

3

The problem with basing a BAPCPA means test analysis on *Cortez*-style reasoning is that, although the "granting of relief" language did not change, nearly everything else about § 707(b) did. Section 707(b)(2)(A)(iii)(I) now specifically refers to "the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following *the date of the petition*." (Emphasis added). Further, § 707(b)(2)(A)(ii)(I) expressly requires that a debtor calculate expenses "as in effect on the date of the order for relief." The statute governing *Cortez* lacked such explicit and undeniable references to the date of the petition. Removing the *Cortez*-based focus on post-petition events from *Singletary*'s analysis, this Court agrees with the result: based on the plain language of the statute, when completing Form B22A, a chapter 7 debtor may deduct future payments on secured debts that are contractually due as of the date of the petition, including debts for mortgages on property to be surrendered, as long as the debtor has not surrendered the collateral as of the petition date.

The U.S. Trustee disagrees with *Walker* and *Singletary*, and relies on *In re Skaggs*, 349 B.R. 594 (Bankr. E.D. Mo. 2006), and *In re Harris*, 2006 WL 2933891 (Bankr. E.D. Okla. Oct. 13, 2006). In *Skaggs*, chapter 7 debtors included in their means test calculation deductions for "average monthly expenses" on debts where the property was going to be surrendered or where the lien was going to be avoided. 349 B.R. at 598. The U.S. Trustee contended that since the debtors would not actually have payments on these debts, these amounts should not be deducted from the means test calculation; the debtors argued that the plain language of the statute would allow them to make this deduction regardless of their intention to surrender the collateral or avoid the liens. *Id.*

The *Skaggs* court first noted that "[i]n interpreting one part of a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Id.* at 599 (quoting *Philbrook v. Glodgett*, 421 U.S. 707, 713 (1975)). The court then took issue with *Walker*'s resort to the common usage definition of "scheduled as contractually due," and combed the text of the Bankruptcy Code for instances where Congress used the phrase "scheduled as." *Id.* This interpretation convinced the court that "scheduled as" was intended to "refer not to the common dictionary meaning for the word schedule (i.e., 'to plan for a certain date'), but to whether a debt is identified on a debtor's bankruptcy schedules." *Id.*

However, although the Bankruptcy Code uses the phrase "scheduled as contractually due" only once (in § 707(b)(2)(A)(iii)), it also uses the phrase "scheduled as" only one time – in § 1111(a), which provides: "A proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that *appears in the schedules* filed under section 521(1)[1] or 1106(a)(2) of this title, except a claim or interest that is *scheduled as* disputed, contingent, or unliquidated." (Emphasis added). While it is readily apparent from the highlighted terms and the context of the section that § 1111(a) is referring to the bankruptcy schedules, there is no similar reference or apparent context in § 707(b)(2)(A)(iii). Broadening the review to include

---

[1] There is no section 521(1) after BAPCPA. Presumably the reference is to § 521(a)(1).

4

the Bankruptcy Code's references to a claim or debt being "scheduled" turns up two provisions that obviously mean "listed on the bankruptcy schedules": § 523(a)(3) (discharge of a debt that is "neither listed nor scheduled under section 521(1)"); and § 554(c) (deemed abandonment of property "scheduled under section 521(1)"), and two provisions that equally obviously do not: § 524(k)(3)(H)(ii) (suggested reaffirmation agreement language "describing the repayment schedule with the number, amount, and due dates or period of payments scheduled to repay the debts reaffirmed to the extent then known by the disclosing party); and § 1326(a)(1)(B) (debtor shall make pre-confirmation payments "scheduled in a lease of personal property directly to the lessor"). This exercise in statutory analysis compels the conclusion that "scheduled as contractually due" does not refer to the bankruptcy schedules. When describing the bankruptcy schedules, Congress included in the statute a reference to the schedules, either directly by name or indirectly by reference to § 521, the provision that requires the debtor to file bankruptcy schedules.[2] On the other hand, when the statute refers to scheduled payments, such as in the reaffirmation or pre-confirmation lease provision, the bankruptcy schedules are not mentioned.[3] Accordingly, this Court respectfully disagrees with *Skaggs* that § 707(b)(2)(A)(iii) is referring to the listing of the debt in the bankruptcy schedules.

In addition to *Skaggs*, the U.S. Trustee relies on *Harris*, a case rejecting *Walker*'s reasoning, and holding that the analysis in *Skaggs* produces a result in line with Congressional intent in enacting BAPCPA: "The means test was intended to 'ensure that those who can afford to repay some portion of their unsecured debts [be] required to do so." *Harris*, 2006 WL 2933891, at *5 (quoting *In re Hardacre*, 338 B.R. 718, 725 (Bankr. N.D. Tex. 2006)). However, when applying an arbitrary test like the means test, which substitutes formulaic calculations for judicial discretion, resort to the "spirit" of the law is inappropriate and leads to misapplication of the statute. As illustrated by the court in *In re Hartwick*,

> A debtor with a $7,000.00 monthly mortgage payment and $2,000.00 in combined vehicle payments on a Hummer and Lexus escapes the presumption of abuse. Another debtor in the same

---

[2] The only exception appears in § 523(a)(10), but reference to the bankruptcy schedules is abundantly clear: "that was or could have been listed or scheduled by the debtor in a prior case concerning the debtor under this title or under the Bankruptcy Act in which the debtor waived discharge."

[3] The legislative history does not suggest that § 707(b)(2)(A)(iii) is referring to the bankruptcy schedules. In describing the means test, the House Report states that the debtor is allowed to deduct "the debtor's average monthly payments on account of secured debts, including any additional payments to secured creditors that a chapter 13 debtor must make to retain possession of a debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents that collateralizes such debts." H.R. Rep. No. 109-31, pt. 1, at 12 (2005).

5

> locale with a mortgage payment $392.00 per month more than the
> Local Standard monthly housing allowed amount of $1,033.00,
> who plans to give up the home post-petition, and who owns a
> modest older vehicle debt free, should be denied the actual housing
> cost at filing deduction and the car ownership expense $427.00,
> suffering the presumption of abuse? How does the first example
> serve the gate-keeping purpose of keeping debtors who can afford
> to pay a portion of their debts out of Chapter 7? How does the
> second example? Not so apparent. What to do? Nothing.
> Application of the means test is not left by the BAPCPA
> legislation to judicial discretion.

2006 Bankr. LEXIS 2755, at *8 (Bankr. D. Minn. Oct. 13, 2006) (footnotes omitted). While the means test may not function perfectly, as noted in *Hartwick*, courts should apply the means test as it was constructed and should not attempt to tamper with it to achieve a particular result in a particular case.

The *Walker* court's interpretation of § 707(b)(2)(A)(iii) is correct for two more reasons. First, because "a court should give effect, if possible, to every clause and word of a statute," *Moskal v. U.S.*, 498 U.S. 103, 109-110 (1990), the distinction between subsections (I) and (II) of § 707(b)(2)(A)(iii) is noteworthy. While subsection (I) refers generally to "amounts scheduled as contractually due," subsection (II) is much more specific. That section refers to payments "necessary to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependants, that serves as collateral for secured debts." 11 U.S.C. § 707(b)(2)(A)(iii)(II). Under the "negative pregnant" rule of statutory construction, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (internal quotations omitted). Subsection II allows the deduction of certain "additional payments," specifically that would allow a chapter 13 debtor to keep necessary property. Congress's failure to limit subsection (I) with such specific, explicit qualifiers, such as "estimate of actual payments on property to be retained by the debtor," is evidence of Congress's failure to intend that result. It follows that scheduled payments on all secured debts are included under subsection (I), regardless of whether the debtor needs the property or will surrender the property.

Finally, using a "snapshot" view of the debtor's expenses on the date of filing makes sense in the context of a chapter 7 case. The distinction between application of the means test in chapter 7 and chapter 13 (where above-median debtors use the means test to determine the disposable income necessary to fund the plan) is explained by the court in *In re Crittendon*, 2006 Bankr. LEXIS 2172 (Bankr. M.D.N.C. Sept. 1, 2006). There, a chapter 13 debtor attempted to claim the same types of deductions as the Debtors here, subtracting average monthly expenses on

a house that had been sold after the date of the petition. The chapter 13 trustee objected to confirmation of the debtor's plan. The court explained:

> The Debtors argue that section 707(b)(2)(A)(iii), in plain language, specifically allows a deduction for "the total of all amounts scheduled as contractually due to secured creditors" and does not condition such calculation on whether the collateral is retained by the debtors after the case is commenced. According to the Debtors, the means test contained in section 707(b)(2) is a "backward looking test" which is designed to measure the debtor's financial condition at the time of filing, and to determine whether at that time the debtor is in need of bankruptcy relief. On that basis, the Debtors conclude that a surrender of collateral after the commencement of the case is inconsequential.
>
> Debtors' argument may be correct in the context of a chapter 7 case in which the court is called upon to determine whether the granting of relief would be an abuse of the provisions of chapter 7. In that context, the application of the provisions of section 707(b)(2) involves a snapshot evaluation of the debtor's financial condition on the petition date such that a surrender of collateral arguably may be irrelevant and inconsequential. However, the situation presented by a section 1325(b) objection in a chapter 13 case is materially different because the timing of the application of section 707(b)(2)(A) and (B) is different in the chapter 13 case.

*Id*. at \*7-9. This difference is critical to understanding the purpose of the means test in a chapter 7 case, interpreting the complicated (and sometimes arbitrary) calculations that comprise it, and establishing a meaningful application of its provisions. The means test is statutorily defined as a mechanism for determining whether a presumption of abuse arises in a chapter 7 case, 11 U.S.C. § 707(b)(2)(A)(i), with reference to expenses "as in effect on the date of the order for relief," *id*. § 707(b)(2)(A)(ii)(I). The test is better described as a "snapshot" on the petition date rather than an evolving progress report on the debtor's finances.

      In this case, according to the Stipulation of the parties, the Debtors had made mortgage payments as late as July 2006. Their petition was filed in August 2006. Although they did not intend to reaffirm the mortgage debts, on the date of the petition (and even as of the date of the U.S. Trustee's Motion to Dismiss), they had not surrendered the homestead. Neither had any other event occurred that would have relieved the Debtors of their contractual obligations to make the scheduled mortgage payments, such as a foreclosure judgment or sale of the property.[4]

---

    [4] Presumably at some point in the foreclosure process under Wisconsin law, the payments on a mortgage debt could no longer be considered scheduled as contractually due.

7

Therefore, the payments on their mortgages were still "scheduled as contractually due" on the date of the petition. Accordingly, these payments were appropriately deducted from the Debtors' current monthly income in performing the means test calculations, the presumption of abuse does not arise, and the U.S. Trustee's Motion to Dismiss under § 707(b)(2) is denied.

The U.S. Trustee alternatively contends that the Debtors' case should be dismissed as an abuse under the "totality of circumstances" test of § 707(b)(3). That section of the Bankruptcy Code states:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph[5] does not arise or is rebutted, the court shall consider–
> (A) whether the debtor filed the petition in bad faith; or
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

Unlike when proceeding under § 707(b)(2), the U.S. Trustee does not enjoy the benefit of a presumption of abuse when pursuing a § 707(b)(3) motion. To succeed, the U.S. Trustee must prove that the debtor filed the case in bad faith or that the totality of the circumstances of the debtor's financial situation demonstrates abuse.

The "totality of circumstances" test has its roots in pre-BAPCPA law. Although the Seventh Circuit Court of Appeals had not weighed in on the issue, a District Court in this Circuit analyzed the case law in *In re Ontiveros*, 198 B.R. 284 (C.D. Ill. 1996). The court explained that in ruling on "substantial abuse" motions under the prior version of § 707(b), the circuit courts devised three main approaches: (1) the *per se* rule of the Eighth and Ninth Circuits under which the debtor's ability to pay his debts, standing alone, justified dismissal; (2) the totality of the circumstances test of the Fourth Circuit which required a showing of more than an ability to pay; and (3) the hybrid approach of the Sixth Circuit which permitted the dismissal based on ability to pay alone, but also allowed the debtor to demonstrate mitigating circumstances. *Id.* at 287.

The means test of § 707(b)(2) appears to be a codification of the *per se* rule, with its presumption of abuse for debtors who have the ability to pay based on application of the means test formula. The Fourth Circuit's "totality of the circumstances" test was adopted by name in

---

That issue is not before the Court in this case.

[5]Although it appears that "such paragraph" refers to "paragraph (1)," § 707(b)(1)(A)(i) does not exist. The presumption referred to in § 707(b)(3) most logically refers to the presumption in § 707(b)(2)(A)(i).

8

BAPCPA § 707(b)(3)(B), suggesting that *something other* than an ability to pay is required to succeed on a Motion to Dismiss under this section. Further, as illustrated in *Ontiveros*, examining the "totality" of the circumstances suggests considering more than one factor (i.e., ability to pay).

In *Green v. Staples (In re Green)*, the Fourth Circuit Court of Appeals held that other factors must be considered in addition to the debtor's ability to fund a chapter 13 plan:

> The "totality of the circumstances" approach involves an evaluation of factors such as the following:
>
> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
>
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
>
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
>
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
>
> (5) Whether the petition was filed in good faith.

934 F.2d 568, 572 (4th Cir. 1991). The Fourth Circuit rejected the notion that ability to pay alone is cause for dismissal as a substantial abuse of chapter 7. *Id.*

Interpreting the § 707(b)(3) test as requiring proof of more than the ability to fund a chapter 13 plan gives appropriate weight to the statutory means test, which is, after all, the Congressional formula for determining ability to pay. To apply the means test, dislike the result, and then examine the debtor's ability to fund a chapter 13 plan under § 707(b)(3), renders the means test "surplusage." For example, line 22 of Form B22A allows a debtor to deduct local standards for transportation, vehicle operation or public transportation. According to Form B22A, these expenses are deductible regardless of whether the debtor pays the expenses of operating a vehicle and regardless of whether the debtor uses public transportation. Debtors in this area can deduct $358 for operating two or more vehicles. If the Schedule J discloses that the debtor was paying significantly less to operate the vehicles (for example, if the debtor was a little old above-median income lady who only drove the vehicles to church on Sunday), it would not appear appropriate for the U.S. Trustee to move for dismissal under § 707(b)(3) solely because the debtor had the ability to use the excess income to fund a chapter 13 plan. To perform the means test and then perform another means test that is more to the U.S. Trustee's liking ignores

the plain language of the statute and would be a waste of judicial resources. In *In re Deaton*, discussing why the "totality of circumstances" test must include more than a simple calculation of the debtor's ability to fund a chapter 13 plan, the court reviewed the legislative history of the "substantial abuse" provision and stated:

> If Congress had intended to institute a system of mandatory Chapter 13, it would have had no difficulty in saying so in direct, explicit language. Congress rejected this proposal, at least in part, because its adoption would have laid an unbearable burden on the bankruptcy court system as presently constituted. That system depends for its viability upon the administrative disposition without significant intervention by the bankruptcy judge, of the great bulk of consumer Chapter 7 cases. To require that official to review every Chapter 7 consumer case and make the kind of careful determination required in determining whether a successful Chapter 13 case could be maintained by the debtor, would call for a great expansion of manpower, and consequent expense, in the bankruptcy court system.

65 B.R. 663, 665 (Bankr. S. D. Ohio 1986).

This Court is not suggesting that the debtor's ability to pay should not be considered as a factor in the "totality of the circumstances" test, or that passing the means test ends the inquiry. For example, where debtors have "manipulated" the means test, the case should be dismissed under § 707(b)(3). As Judge Wedoff explained in *Means Testing in the New § 707(b):*

> Thus, for purposes of the means test, debt secured even by such items as luxury vehicles, pleasure boats, and vacation homes would be deductible. Moreover, under a plain language analysis, the balance of a balloon mortgage that became contractually due during the five years after the bankruptcy filing - and perhaps even the total balance due on a defaulted mortgage that had been contractually accelerated - would be entirely deductible. However, if deductions of this sort allowed a wealthy debtor to avoid the presumption of abuse under the means test, an abuse might still be found in consideration of the "the totality of the circumstances ... of the debtor's financial situation" pursuant to 707(b)(3).

79 Am. Bankr. L.J. 231, 273 (Spring 2005).

Moreover, the cases that have granted § 707(b)(3) "totality of the circumstances" motions based on a debtor's ability to pay are distinguishable from this one. *In re Paret*, 347 B.R. 12 (Bankr. D. Del. 2006), *In re Pennington*, 348 B.R. 647 (Bankr. D. Del. 2006), and *In re Pak*, 343 B.R. 239 (Bankr. N.D. Cal. 2006), all involved below-median income debtors. Accordingly, the courts in those cases, limited by § 707(b)(7), were prohibited from subjecting those debtors to the means test under § 707(b)(2). Since no means test was performed, an inquiry into the

10

debtors' ability to pay was rightly conducted, *for the first time*. Here, the Debtors have already undergone - and passed - the means test. As § 707(b)(3) states, the court shall consider the totality of the circumstances "in a case in which the presumption . . . does not arise [(i.e., the debtor passed the means test)] or is rebutted [(i.e., the debtor failed the means test, but provided a sufficient explanation)]." This language suggests that an inquiry into a debtor's financial situation requires an inquiry into *more than* what is tested in the means test.

Under the pre-BAPCPA totality of the circumstances test, proof of more than just an ability to fund a chapter 13 plan was needed to demonstrate "substantial abuse."[6] *Green*, 934 F.2d at 572. Stated another way, while ability to pay is a factor in the totality of circumstances test, and may even be the primary factor to be considered, if it is the only indicia of abuse, the case should not be dismissed under that test. Given the detailed nature of the means test in § 707(b)(2), this Court holds that similar to the old totality of the circumstances test, more than an ability to pay (as shown on the debtor's Schedule I and J) must be shown to demonstrate abuse under § 707(b)(3)(B). This additional evidence may include the *Green* factors, or may point to a manipulation of the means test as illustrated by Judge Wedoff's article.[7]

In this case, the parties focused almost exclusively on § 707(b)(2), and very little evidence was introduced at the hearing relating to the totality of the circumstances test under § 707(b)(3). Before the Court can decide whether the totality of the circumstances illustrates abuse and warrants dismissal of the Debtors' case, the parties must improve the record and support their § 707(b)(3) arguments. The Court will schedule a hearing at which the U.S. Trustee will be allowed to establish that additional factors warrant dismissal, and the Debtors will be allowed to establish any mitigating factors that would suggest this case is not an abuse of chapter 7 under the totality of the circumstances.

Dated: December 14, 2006

By the Court:

*Susan Kelley*
Susan V. Kelley
U.S. Bankruptcy Judge

---

[6] It should be noted that pre-BAPCPA "substantial abuse" and BAPCPA "abuse" are, so far, virtually the same. As *Collier on Bankruptcy* observes: "The 2005 amendments also changed the standard for dismissal from 'substantial abuse' to 'abuse.' It is unclear how much impact this will have; few, if any, courts permitted a chapter 7 case to proceed because they found it to be an abuse, but not a substantial abuse, under prior law. If courts found cases to be abusive under the totality of the circumstances, those cases were dismissed. 6 Alan N. Resnick & Henry J. Somer, *Collier on Bankruptcy* ¶ 707.05[1] (15th ed. rev. 2006).

[7] In another article, *Judicial Discretion to Find Abuse Under § 707(b)(3)*, Judge Wedoff paints an even more drastic example of manipulation of the means test, in which a wealthy CEO is unemployed for the 6 months prior to the petition, and then becomes re-employed. This Court agrees that such a case should be dismissed under § 707(b)(3), even though the debtor's case is not a presumed abuse under the means test. 25 Am. Bankr. Inst. J. 1 (April 2006).